UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

CHRISTINA GONZALEZ,

Plaintiff,

-against-

CITY OF NEW YORK, et al.,

Defendants.

-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:9/29/2016
```

14 Civ. 7721 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

Plaintiff Christina Gonzalez commenced this action asserting violations of her First, Fourth and Fourteenth Amendment rights based on her arrest by the New York Police Department ("NYPD") on four separate occasions in 2011 and 2012.  The Court previously dismissed some defendants and some claims from the First Amended Complaint (the "Complaint").  The remaining Defendants, Dionis Bravo, David Gonzalez, Eugene Mascari, Angela Nieves, Lissette Nieves and Juan Medina -- all members of the NYPD at the time of the incidents -- move for summary judgment on the remaining false arrest and First Amendment claims pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, the motion is granted in part and denied in part.

I.   **BACKGROUND**

The following facts are taken from the materials submitted in connection with this motion and, as required on this motion, viewed in the light most favorable to Plaintiff as the non-moving party.

   A.   **First Incident -- September 24, 2011**

On September 24, 2011, Plaintiff Christina Gonzalez was at Zuccotti Park in lower Manhattan when a march began.  Hundreds and eventually thousands of people participated in

the march, which wound its way through lower Manhattan.  Plaintiff walked in the roadway with other protesters and filmed as she went.  The march reached the intersection of University Place and East 12th Street around 2:00 p.m.

Videos submitted on this motion first show the intersection crowded with people who were excited, shouting and heedless of vehicular traffic and traffic signals.  Defendants cleared most of them from the roadway with verbal orders and gestures.  In the first video, orders to "get out of the street" and "get on the sidewalk" can be heard.  Plaintiff heard orders to "go home" and "get out of here."  Officers deployed orange netting to keep protesters out of the street.  After police cleared most of the crowd from the intersection, Plaintiff continued walking and filming in the street.  She said to police officers impeding her view, "Get the fuck out of the way."

NYPD duty captain Brendan Timoney, who is not a party in this action, pointed out Plaintiff and ordered her arrest.  He attests that he saw Plaintiff walk into the intersection past several police officers when officers were trying to clear protesters from the intersection.  He then pointed out Plaintiff and ordered her arrest.  Plaintiff heard someone say "get her," and Plaintiff attempted to run away.  Members of the NYPD, allegedly including Defendant Bravo, arrested Plaintiff.  The arrest report states that she was arrested for disorderly conduct in violation of N.Y. Penal Law § 240.20(5) (obstructing traffic) and § 240.20(6) (refusing to disperse).  She was later also charged with violating N.Y. Penal Law § 205.30 for resisting arrest and § 195.05 for obstruction of governmental administration in the second degree.

### B.     Second Incident -- January 1, 2012

On January 1, 2012, Plaintiff and other protestors associated with the Occupy Wall Street movement, left Zuccotti Park and began marching uptown.  Defendant Mascari, an NYPD detective, observed and recorded Plaintiff marching in the roadway.  NYPD officers

accompanied protesters and ordered them to stay on or get on the sidewalk.  A video shows Plaintiff moving in a crowd of at least a hundred people, walking in the middle of the roadway around traffic and, in response to the question "Whose streets?," chanting "Our streets."  At times in the video, protesters are seen blocking cars and, at other times, cars are brought to a standstill by the number of people in the street.  Plaintiff contends that the police issued orders to "Go Home!"

Plaintiff was arrested on the sidewalk at the corner of Fifth Avenue and 13th Street, but admits that she had been walking in the street.  After Plaintiff was placed in custody, a supervisor instructed Defendant Gonzalez to place handcuffs on Plaintiff.  He did so, then escorted her to a transport vehicle and processed her arrest at the precinct.  Plaintiff was later charged with violating N.Y. Penal Law § 240.20(5) for disorderly conduct (obstructing traffic).

### C.     Third Incident -- June 17, 2012

On June 17, 2012, Plaintiff was participating in a march near 78th Street and Fifth Avenue, along with hundreds or thousands of other protesters.  Plaintiff and other marchers walked in the roadway.  When the march neared the intersection, Plaintiff took out her camera and began filming.  In videos, a crowd of police officers and protesters are in the middle of the roadway, and police officers can be seen on bullhorns talking to the crowd.

As officers moved people toward the side of the road, Plaintiff's sister was arrested. Police then set up metal barricades and orange netting along the roadway and sidewalk.  Plaintiff tried to reach her sister but could not because of the metal barricades.  Plaintiff claims that she was angry because she saw her sister "physically assaulted by several police officers" during the arrest.  Plaintiff grabbed the metal barricades, shaking them and yelling at the officers.  Plaintiff pushed the metal barricades into non-party Sergeant DeJesus.  He told her to "relax, relax," and

3

she pushed the metal barricades at him second time, slightly injuring him.  Sergeant DeJesus

then tried to arrest Plaintiff, but other protesters pulled her free.  The police later located, arrested

and charged her with violations of N.Y. Penal Law § 120.11 for assault of a police officer with a

deadly weapon, § 195.05 for obstructing governmental administration in the second degree, §

205.30 for resisting arrest, and § 240.20(6) for disorderly conduct (refusing to move on).

### D.      Fourth Incident - July 31, 2012

On July 31, 2012, Plaintiff was walking in Harlem when she observed Defendant

Medina, an NYPD officer, issuing a traffic ticket to a motorist stopped on the side of the

roadway.  Plaintiff began filming and walked into the roadway.  Her video shows Medina issuing

a ticket to the motorist, then walking toward his car and getting inside.  Plaintiff followed,

filming the license plate and then approaching the driver-side window, and filming Medina

inside his vehicle.

The video shows that Medina noticed Plaintiff, stepped out the car and asked to see her

identification.  She refused.  Medina asked why she was recording him.  Plaintiff replied that she

saw him performing a stop and was trying to obtain his name and license plate.  Medina asked

again for Plaintiff's identification.  She declined and shouted at him to stop touching her bag.  He

requested her identification a third time.  She told him that he did not have the right to see it, she

had done nothing wrong, and he should not ask for her identification.  Medina said that he was

trying to identify her.  She replied that her name is Christina and that her face is on the precinct

wall.  Medina told her to stay and not to move.  She appeared to walk away, and is heard on the

film telling Medina not to put his hands on her.  He again asked for her identification.  She

answered again that he did not have the right to see it and that she had done nothing wrong.

Their voices rose while they spoke over one another, and Plaintiff said that she had the right to

4

film him and that she was going to leave.  Medina said that he was going to arrest her and told

her to stay where she was.  As Plaintiff attempted to walk away, Medina said "don't make me

cuff you here."  Plaintiff asked why he would cuff her.  He did not respond and called for

backup.  After another officer arrived, Plaintiff was placed in handcuffs.  When she asked why

she was being arrested, Medina responded "for disorderly conduct."  Plaintiff was in handcuffs

for approximately five minutes and then released.  The interaction between Plaintiff and Medina

lasted about fifteen minutes.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the record before the Court establishes that there

is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty

Lobby, Inc*., 477 U.S. 242, 248 (1986).  Courts must construe the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in the non-moving party's

favor.  *See Young v. United Parcel Serv., Inc*., 135 S. Ct. 1338, 1347 (2015); *In re Agent Orange

Prod. Liab. Litig*., 517 F.3d 76, 87 (2d Cir. 2008).

The moving party bears the initial burden of informing the court of the basis for the

summary judgment motion and identifying those portions of the record that demonstrate the

absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c)(1); *see, e.g., Celotex

Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Koch v. Town of Brattleboro*, 287 F.3d 162, 165

(2d Cir. 2002).  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  *Liberty Lobby*, 477 U.S.

at 248.

The Court may consider video evidence in determining whether material questions of fact exist.  *See Scott v. Harris,* 550 U.S. 372, 379–80 (2007); *Fabrikant v. French,* 691 F.3d 193, 201 n. 6 (2d Cir.2012) (affirming grant of summary judgment based on probable cause and qualified immunity in part relying on video evidence where plaintiff did not dispute accuracy of video, but "dispute[d] only how to characterize that evidence"); *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 551 (E.D.N.Y. 2015) (granting summary judgment based on qualified immunity supported by video evidence).

## III.  DISCUSSION

Plaintiff brings this action under 42 U.S.C. § 1983 alleging violations of her rights under the First, Fourth and Fourteenth Amendments by NYPD officers during four separate arrests. Surviving after the motion to dismiss are Plaintiff's false arrest claims relating to all four incidents, and her First Amendment claims relating to the first three incidents.  Defendants move for summary judgment on all remaining claims on the ground that Plaintiff's arrests were supported by probable cause.  In the alternative, Defendants argue that the doctrine of qualified immunity shields them from liability on the false arrest claims, and that Defendants' lack of any First Amendment animus bars liability on the First Amendment claims.

### A.    Applicable Law

#### 1.    Establishing a Claim Under 42 U.S.C. § 1983

Plaintiff asserts her claims under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

A Section 1983 claim "has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) (citation omitted).

### 2.      Fourth Amendment Claims -- False Arrest

"A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law.  Under New York law, an action for false arrest requires that the plaintiff show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (alteration in original) (internal quotation marks and citations omitted).  An individual is seized for purposes of the Fourth Amendment "when the officer, by means of physical force or show of authority, terminates or restrains [her] freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citation omitted).  "Handcuffs are generally recognized as a hallmark of a formal arrest," *U.S. v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004), but "not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness." *United States v. Bailey*, 743 F.3d 322, 340 (2d Cir.), *cert. denied*, 135 S. Ct. 705 (2014).  "The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat." *Id.*

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has

qualified immunity." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (citation

omitted).  Probable cause is a complete defense to a false arrest claim.  *Id*.

   "Under both federal and New York law, an officer has probable cause to arrest when he

or she has knowledge or reasonably trustworthy information of facts and circumstances that are

sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has

committed or is committing a crime." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal

quotation marks and citation omitted).  "Probable cause is determined on the basis of facts

known to the arresting officer at the time of the arrest." *Shamir v. City of New York*, 804 F.3d

553, 557 (2d Cir. 2015) (internal quotation marks and citation omitted).  "Whether probable

cause existed for the charge actually invoked by the arresting officer at the time of arrest is

irrelevant.  Accordingly, Defendants prevail if there was probable cause to arrest Plaintiff for any

single offense." *Ackerson*, 702 F.3d at 20 (internal citations and quotation marks omitted).

"[P]robable cause does not demand that an officer's good-faith belief that a suspect has

committed or is committing a crime be 'correct or more likely true than false.'  It requires only

facts sufficient to establish the sort 'of fair probability on which reasonable and prudent [people,]

not legal technicians, act.'" *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)

(alteration in original) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) and *Florida v. Harris,*

133 S.Ct. 1050, 1055 (2013)).  "At most, probable cause may be defeated if the officer

deliberately disregard[s] facts *known to him* which establish justification." *Garcia*, 779 F.3d at

93 (internal quotation marks and citation omitted).

   The existence of probable cause "need not be assessed on the basis of the knowledge of a

single officer." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  Officers can rely on

knowledge that is collective or imputed.  An arrest "is permissible where the actual arresting or

8

searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *Id.* (quoting *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001)).

### 3.      Qualified Immunity

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (citation omitted). "A state actor charged under § 1983 with violating a plaintiff's constitutional rights is entitled to have the action dismissed on the basis of qualified immunity if at the time of the challenged conduct there was no clearly established law that such conduct constituted a constitutional violation." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (internal quotation marks and citation omitted). "[Q]ualified immunity attaches if it was objectively reasonable for the officer to believe that his actions were lawful at the time of the challenged act." *Id.* (internal quotation marks and citation omitted). In addressing this issue, a district court must examine two questions: First, whether "the facts show that [the officer's] conduct violated plaintiff['s] constitutional rights," and second, whether the right was "clearly established at the time of defendants' actions." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014). If the answer to either question is negative, the defendant is entitled to qualified immunity. *Id.* "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 132 S. Ct. at 2093 (internal quotation marks and citation omitted).

In a suit alleging false arrest, an officer acting without probable cause is entitled to qualified immunity if he can show that he had at least "arguable probable cause" for the arrest, which exists if either "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia*, 779 F.3d at 92 (quoting *Zalaski*, 723 F.3d at 390). The standard is deferential. "In other words, an officer lacks arguable probable cause and is not entitled to qualified immunity only where no officer of reasonable competence could have made the same choice under the circumstances." *Myers*, 819 F.3d at 633 (internal quotation marks and citation omitted).

### 4.    First Amendment Claims

The First Amendment of the U.S. Constitution prohibits any laws "abridging the freedom of speech . . . or the right of the people peaceably to assemble," clearly "protect[ing] political demonstrations and protests -- activities at the heart of what the Bill of Rights was designed to safeguard." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (alteration in original). Central to the proper functioning of democracy, the First Amendment "vigorously protects" speech activity, even where that the speech may be objectionable, or even repugnant, to some, reflecting a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Such speech is the "essence of self-government," occupying "the highest rung of the hierarchy of First Amendment values." *Id.* (internal quotation marks and citations omitted). Peaceful social protest, in particular, is a "basic and fundamental" right "so important to the preservation of the freedoms treasured in a democratic society. . . . dedicated to liberty under law." *Cox v. Louisiana*, 379 U.S. 559, 574

(1965); *Parmley*, 465 F.3d at 56 ("[P]olitical demonstrations and protests [are] activities at the heart of what the Bill of Rights was designed to safeguard." (citation omitted)).

While the rights protected by the First Amendment are critical to a well-functioning democracy, the protections of the First Amendment "are not absolute." *Parmley*, 465 F.3d at 56. For example, there is no doubt "that government officials may stop or disperse public demonstrations or protests where 'clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears.'" *Id.* at 56-57 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)).  Two branches of First Amendment claims are relevant to the present case: (a) interference with the right to protest in a public forum and (b) retaliation for exercising First Amendment rights.

### a.      Time, Place and Manner Restrictions on Speech in Public Fora

"Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is very limited." *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014) (internal quotation marks and citation omitted). However, the government is permitted to enforce reasonable content-neutral "time, place, and manner restrictions." *Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).  Even in traditional public fora, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Id*. Time, place and manner restrictions in a public forum are permissible if they "(1) are justified without reference to the content of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information." *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir.

2012) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted).

The government has a "strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (citation omitted). "A regulation is narrowly tailored so long as it promotes a substantial government interest that would be achieved less effectively absent the regulation and is not substantially broader than necessary to achieve the government's interest." *Marcavage*, 689 F.3d at 106 (citing *Ward*, 491 U.S. at 799-800) (internal quotation marks omitted). "[N]arrowly tailored does not mean the least restrictive or least intrusive means." *Id.* (internal quotation marks and citation omitted).

An alternative channel for communication is "adequate and therefore ample" in the Second Circuit "if it is within close proximity to the intended audience." *Id.* at 107 (internal quotation marks and citation omitted). "[T]he First Amendment does not guarantee protesters access to every or even the best channels or locations for their expression." *Id.* (internal quotation marks and citation omitted). The requirement also "does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs . . . indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed ample." *Costello v. City of Burlington*, 632 F.3d 41, 47 (2d Cir. 2011) (internal quotation marks and citation omitted).

While time, place, and manner restrictions are "more typically invoked in the context of an *ex ante* restriction. . . . the Second Circuit has recognized that a spontaneous police order to

demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine."

*Akinnagbe*, 128 F. Supp.3d at 548-49 (discussing *Zalaski*, 723 F.3d at 388).

### b.       Retaliation for Exercising First Amendment Rights

To prevail on a claim for retaliation based on exercising free speech rights, a plaintiff must prove that "(1) [she] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [her] exercise of that right; and (3) defendant's actions caused [her] some injury."  *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citation omitted).  As to the second element, "specific proof of improper motivation is required in order for a plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (citation omitted).  When the alleged retaliation is in the form of an arrest, probable cause will defeat the First Amendment claim.  *Id.* ("[B]ecause defendants had probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be undertaken."  (citation omitted)).  With respect to the third element, when the alleged harm is that a plaintiff's speech was chilled, a plaintiff must show that her First Amendment rights were "actually chilled."  *Id.*  "[A]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.* (internal quotation marks and citation omitted).  "Where a party can show no change in [her] behavior, [she] has quite plainly shown no chilling of [her] First Amendment right to free speech."  *Id.* (citation omitted).

### B.       Application

### 1.       First Incident:  September 2011, No Constitutional Violation

Plaintiff asserts that Defendant Bravo violated her First and Fourth Amendment rights when he arrested her in September 2011.  Summary judgment is granted on these claims because Plaintiff has failed to adduce facts from which a reasonable jury could find in her favor.

Even construing the facts in her favor, Plaintiff has presented no evidence from which a reasonable jury could find that the arresting officers lacked probable cause to arrest her for disorderly conduct for refusing to disperse in violation of New York Penal Law § 240.20(6). The elements for disorderly conduct are: (1) conduct of a public nature, (ii) undertaken with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to "a risk thereof," and (iii) matching at least one of the descriptions set forth in the statute.  *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001).  A person is guilty of disorderly conduct under subsection 6 of the statute when "with the intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [she] congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."  N.Y. Penal Law § 240.20(6).

As to the first element, the New York Court of Appeals has explained that disorderly conduct requires conduct "of a public rather than an individual dimension," and the "significance of the public harm element . . . cannot be overstated."  *People v. Baker*, 984 N.E.2d 902, 905-06 (N.Y. 2013).  "[E]vidence of actual or threatened public harm ('inconvenience, annoyance or alarm') is a necessary element . . . ."  *People v. Johnson*, 9 N.E.3d 902, 903 (N.Y. 2014). Whether a person has committed disorderly conduct is determined through "a contextual analysis that turns on consideration of many factors, including 'the time and place of the episode . . . ; the

nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances.'" *Baker*, 984 N.E.2d at 906 (quoting *People v. Weaver*, 944 N.E.2d 634, 636 (N.Y. 2011)).

Here, it is undisputed that Plaintiff's actions on September 24, 2011, were public in nature. Plaintiff and hundreds of others had marched through the streets and eventually congregated in and near the intersection at 12th Street and University Place, a public roadway. Plaintiff was engaged in protest activity.

Second, the videos offer sufficient undisputed evidence to warrant an officer of reasonable caution to believe that Plaintiff's actions were intentional or reckless as to the risk of public inconvenience by blocking the road. *See Pesola v. City of New York*, Nos. 15-CV-1917, 15-CV-1918, 2016 WL 1267797, at *6 (S.D.N.Y. Mar. 30, 2016) (arresting officer had reasonable belief that plaintiffs acted recklessly in creating risk of causing public inconvenience, annoyance or alarm where they moved closer to crowd to observe and photograph arrests instead of complying with order to back up or disperse). The videos show that vehicles have stopped at the threshold of the intersection, but that none have entered it, and that their progress is blocked by people in the roadway. The videos undermine Plaintiff's speculation that the cars may have stopped to observe or drop off passengers.

Third, the videos show that Plaintiff refused to comply with a police order to disperse. Initially crowds of excited people were in the intersection and then, due to the efforts of the police, most of the crowd members left the intersection for the sidewalk. The police told the crowd to leave and get out of the street and deployed orange netting to keep people out of the

intersection.  Plaintiff walked through the intersection, directly through a group of police officers, and then told them to "get the fuck out of the way."

The arresting officers reasonably believed that Plaintiff refused to comply with a *lawful* dispersal order, as required by § 240.20(6).  The government may enforce reasonable time, place and manner restrictions, under the heightened First Amendment standard applicable here[1] and explained above, provided the restrictions are content neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication. *Marcavage*, 689 F.3d at 104.  Here, the dispersal order satisfies that test.  There is no evidence that the dispersal order was due to the content of the speech.  The government has a "strong interest in ensuring the public safety and order [and] in promoting the free flow of traffic on public streets." *Madsen*, 512 U.S. at 768.  Finally, the dispersal order was narrowly tailored, and protesters had ample alternative channels for communication, as the police directives were aimed primarily at removing protesters from the street and onto the sidewalk.  *See Zalaski*, 723 F.3d at 393-95 (Arrest of demonstrators for refusing to comply with order to move 20 feet away to make way for a foot race was not a violation of First Amendment rights).  Consequently, no reasonable jury could find that the police lacked probable cause to believe that Plaintiff had violated § 240.20(6) for failure to comply with a lawful dispersal order.

Plaintiff argues that she was in the process of leaving the intersection when she was arrested and that the dispersal orders were unclear, conflicting and not sufficiently narrowly

---

[1] Defendants argue that an order to dismiss is lawful unless the order was "purely arbitrary" and "not calculated in any way to promote public order."  *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010) (summary order) (quoting *People v. Galpern*, 181 N.E. 572, 574 (N.Y. 1932)).  Because this case involves a political demonstration and raises First Amendment concerns, the order is reviewed under a heightened First Amendment standard, and not the "purely arbitrary" standard. *See Akinnagbe*, 128 F. Supp. 3d at 547-550.

tailored.  These factors do not defeat a finding of probable cause, which turns on the knowledge of the arresting officers at the time of the arrest.  *See Shamir*, 804 F.3d at 557.  Whatever Plaintiff's intentions may have been, the videos submitted show Plaintiff walking past officers into the intersection as the officers were attempting to clear the intersection with verbal orders and gestures and by deploying orange nets.  Under these circumstances, a reasonable officer could have concluded, as the duty captain attests he did, that Plaintiff had not complied with a lawful order even though there was ample time for scores of other people to do so.  Furthermore, a "prohibition against obstructing traffic is hardly vague, and it would have been clear to any person [that by being present in the street] the protesters were occupying a location where they were not ordinarily permitted to be."  *Garcia*, 779 F.3d at 95.

Separate from her claim of false arrest, Plaintiff claims that Defendant Bravo interfered with her First Amendment rights by arresting her when she was engaged in a First Amendment activity (public protest) in a public forum; and that he arrested her in retaliation for exercising her First Amendment rights.  On the interference claim, as discussed above, the orders to clear the roadway and get on the sidewalk were reasonable, content-neutral restrictions on the place of the protected speech, and therefore did not unlawfully interfere with Plaintiff's First Amendment right to protest.  To the extent that Plaintiff argues that orders to "go home" or "get out of here" unlawfully restricted with her First Amendment rights and were improper time, place and manner restrictions, there is no evidence, nor does Plaintiff claim, that Defendant Bravo -- the only Defendant named for this incident -- gave such an Order.  On the retaliation claim, because there was probable cause for Plaintiff's arrest, an inquiry into the underlying motive for the arrest is unnecessary to grant summary judgment.  *Curley*, 268 F.3d at 73.  Summary judgment is granted on this First Amendment claim.

17

Plaintiff argues that blocking or interfering with vehicular traffic may be a basis for restricting protesters' rights only if the interference is a threat to public safety, for example, if protesters sit in a roadway so that cars have to swerve around them. Plaintiff's argument is too broad and misreads the law. The Supreme Court is clear that the activities of protesters are subject to reasonable time, place and manner restrictions even short of a threat to public safety. "The fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views whenever and however and wherever they please." *Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (internal quotation marks and citation omitted), *accord Heffron*, 452 U.S. at 647; *Cox*, 379 U.S. at 554. The government has the right "to regulate the use of city streets . . . to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly." *Cox*, 379 U.S. at 554 (citation omitted). "The control of travel on the streets is a clear example of governmental responsibility to insure . . . necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection." *Id.* "A group of demonstrators could not insist upon the right to cordon off a street . . . and allow no one to pass who did not agree to listen to their exhortations." *Id.*

Summary judgment is granted on Plaintiff's claims under the First and Fourth Amendment in relation to the September 2011 incident.

### 2.    Second Incident:  January 2012, No Constitutional Violation

Plaintiff asserts violations of her Fourth and First Amendment rights by Defendants Mascari and Gonzalez in connection with the January 2012 incident. Summary judgment is granted on these claims because the arresting officers had probable cause to arrest Plaintiff.

Defendants assert that there was probable cause to arrest Plaintiff for disorderly conduct for obstructing traffic under New York Penal Law § 240.20(5), among other violations.  In addition to the elements for disorderly conduct discussed above -- (i) conduct of a public nature, (ii) done with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to "a risk thereof" -- subsection five prohibits conduct that "obstructs vehicular or pedestrian traffic."  N.Y. Penal Law § 240.20(5).

Here, the undisputed evidence shows that the arresting officers had a reasonable basis to conclude that these elements were satisfied.  Plaintiff's conduct on January 1, 2012, was of a public nature; she marched through the streets of lower Manhattan and was eventually arrested at 12th Street and Fifth Avenue.  Second, her conduct and the context reasonably lead to the conclusion that Plaintiff intended to cause public inconvenience, or at least acted with recklessness to the risk of public inconvenience.  The videos show Plaintiff marching in the middle of the roadway with hundreds of other protesters.  She walks around cars and, in response to the question "Whose streets?," chants with others, "Our streets!"  Amidst honking cars brought to a standstill by the crowd marching through the streets, officers are heard and seen on the video repeatedly giving verbal and physical direction to protesters to stay on the sidewalk.  Viewed in context, a reasonable officer could have concluded that Plaintiff was obstructing vehicular traffic and intended to cause "public inconvenience [or] annoyance or . . . [was] recklessly creating a risk thereof."  Therefore, no question of fact exists that the arresting officers had probable cause to arrest Plaintiff for a violation of § 240.20(5).

The Complaint pleads a First Amendment retaliation claim regarding the January 2012 incident.  It alleges that Plaintiff's arrest was "in retaliation for the exercise by Plaintiff of her 1st Amendment right to express political opinions verbally and by her physical presence . . . and

were intended to discourage her from ever doing so again."  The undisputed probable cause evidence defeats the First Amendment retaliation claim as well as the Fourth Amendment claim discussed above.  *See Curley*, 268 F.3d at 73.

Plaintiff asserts that the police accompanying marchers gave orders to "go home!" and that these orders were not narrowly tailored.  This assertion implies that Plaintiff may be attempting to argue that Defendants restricted her speech through improper time, place and manner restrictions.  Crediting what Plaintiff said she heard, there is no evidence, nor does she assert, that Defendants Mascari or Gonzalez -- the only Defendants named for this incident -- gave such orders.

Defendants' motion for summary judgement is granted on Plaintiff's claims arising from the events of January 1, 2012.

### 3.     Third Incident:  June 2012, No Constitutional Violation

Plaintiff asserts violations of her First and Fourth Amendment rights by Defendants Lissette Nieves and Angela Nieves in connection the June 2012 incident.  Although the parties contest whether these defendants were involved in the arrest, summary judgment is granted because the arresting officers, regardless of their identities, had probable cause for the arrest.

Defendants assert that probable cause existed for Plaintiff's arrest on June 17, 2012, based on her violation of, among other statutes, § 240.20(1) and (7) (disorderly conduct).  In addition to the elements of disorderly conduct discussed above -- (i) conduct of a public nature, (ii) done with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to "a risk thereof" -- these provisions require that Plaintiff "engage[d] in fighting or in violent, tumultuous or threatening behavior," or that "[s]he create[d] a hazardous or physically offensive

condition by any act which serves no legitimate purpose." *Provost v. City of Newburgh*, 262 F.3d at 157; N.Y. Penal Law § 240.20(1) & (7).

Here, after seeing her sister's arrest and angry at the police for their conduct during the arrest, Plaintiff grabbed a metal barricade at the edge of the sidewalk and began shaking it and yelling at officers. She violently pushed the barricades into officers, and after an officer tried to calm her, she pushed the barricades at him, causing a minor injury. She was later arrested for the assault.

Based on the undisputed evidence, a reasonable officer would have had probable cause to arrest Plaintiff for disorderly conduct. The conduct was of a public nature, and a reasonable officer could find that Plaintiff's yelling and shaking the barricade was intended to cause alarm or was reckless as to the risk of causing alarm. An officer could also reasonably find that Plaintiff's shaking the metal barricade served no legitimate purpose in the midst of the crowded street corner and risked harming those nearby, and in fact harmed a police officer. *See Weaver*, 944 N.E.2d at 637 (jury had sufficient evidence to conclude defendant guilty of disorderly conduct where "over a short time period, defendant's conduct escalated into a very vocal and aggressive confrontation," defendant was warned to cease his conduct, but defendant became increasingly agitated and belligerent). Consequently, the arresting officers had probable cause for Plaintiff's arrest. This finding warrants summary judgment on both the Fourth Amendment and First Amendment claims arising from the June 2012 incident.

### 4.    Fourth Incident:  July 2012, No Basis for Summary Judgment

The Complaint asserts a Fourth Amendment claim against Defendant Medina arising from the July 2012 incident. The related First Amendment Claim was dismissed on a prior

motion.  Summary judgment is denied because the arrest was not supported by probable cause or arguable probable cause.

The Complaint alleges that Defendant Medina "arrest[ed] Plaintiff and placed her in handcuffs" without probable cause.  Plaintiff has adduced evidence from which a reasonable jury could conclude that Plaintiff was arrested.  The video shows that Plaintiff attempted to walk away multiple times, was prevented from doing so, and was eventually placed in handcuffs. Restraining Plaintiff in this fashion, even for only five minutes, constituted an arrest since Plaintiff posed no physical threat.  *See Bailey*, 743 F.3d at 340 (handcuffing usually "renders a stop an arrest" except when "the person detained poses a present physical threat and . . . handcuffing is the least intrusive means to protect against that threat" (citations omitted)); *Newton*, 369 F.3d at 676 (collecting cases).  Defendants describe Defendant Medina's "right to inquire" and his "brief stop" of Plaintiff, but the relevant inquiry on this § 1983 claim for false arrest is whether Defendant Medina arrested Plaintiff and, if so, whether he had probable cause for the arrest.

Defendants argue that Medina had probable cause to arrest based on two separate traffic infractions.  The first prohibits walking along or in a roadway where sidewalks are provided. N.Y. Veh. & Traf. § 1156(a).  This provision is not applicable in New York City and therefore cannot provide probable cause for an arrest.  *See Barbosa v. Dean*, 390 N.Y.S.2d 79, 80 (App. Div. 1st Dep't 1976) ("We note that Vehicle and Traffic Law s 1156 subd. (a) . . . is not effective in the City of New York . . . .") *appeal denied*, 362 N.E.2d 627 (1977); Committee on Pattern Jury Instructions Assoc. of Supreme Court Justices, N.Y. Pattern Jury Instr. – Civil 2:76 ("If there was a sidewalk, VTL § 1156(a) must be charged instead of VTL § 1156(b).  These sections do not apply in the City of New York . . . .").

22

The second traffic provision on which Defendants rely states: "No pedestrian shall cross any roadway at an intersection except within a crosswalk." N.Y. City, Rules, Tit. 34, § 4-04(c)(2). Here, the video shows that Plaintiff was not at an intersection and was not crossing the roadway. The video, which Plaintiff filmed throughout the encounter, shows that Plaintiff stepped into the roadway while Defendant Medina issued a ticket to the driver of a vehicle that was stopped on the side of the street. Thereafter, Plaintiff, walking parallel to the sidewalk, followed Defendant Medina in the direction of his parked car, filmed the license plate of Medina's car, and proceeded next to the car as Medina entered it. Plaintiff stopped approximately at the rear driver's side window of the sedan. These facts do not sustain a finding of probable cause, arguable probable cause, or even reasonable suspicion that Plaintiff had violated § 4-04(c)(2).[2]

Defendants also argue that Plaintiff's conduct violated New York Penal Law § 195.05, which states, in relevant part:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs, or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act.

---

[2] Even if Defendant Medina had probable cause to believe that Plaintiff had committed a violation of the New York City traffic rules, it is unclear that a pedestrian's violation of a traffic rule, which does not constitute even a misdemeanor under state law, could support an arrest under the Fourth Amendment. *See Glasgow v. Beary*, 2 F. Supp. 3d 419, 423-25 (E.D.N.Y. 2014) (raising question about whether a full custodial arrest based on probable cause for a non-criminal traffic infraction is constitutional, noting that this would subject an individual to be handcuffed, searched and divested of property; kept in a jail cell for forty-eight hours without encountering a judicial officer, and forced to undergo a visual inspection of genitals). *But see United States v. McFadden*, 238 F.3d 198, 203 (2d Cir. 2001) (holding that police had probable cause to arrest an individual seen riding a bicycle on the sidewalk -- a traffic infraction under New York City law -- and that the arrest did not violate the Fourth Amendment), *cert. denied*, 534 U.S. 898 (2001).

N.Y. Penal Law § 195.05.  The crime has four elements:  "(1) prevention or attempt to prevent

(2) a public servant from performing (3) an official function (4) by means of intimidation, force

or interference."  *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (internal

quotation marks and citation omitted).  Regarding the fourth element, "[i]t is axiomatic that 'only

physical interference . . . is encompassed in the [interference] method of obstruction.'"  *Uzoukwu*

*v. City of New York*, 805 F.3d 409, 414 (2d Cir. 2015) (quoting *People v. Case*, 365 N.E.2d 872,

875 (N.Y. 1977)).  "[P]urely verbal interference may not satisfy the 'physical component . . . .'"

*Id.* at 414-15 (citation omitted).

     Here, Defendants do not suggest that Plaintiff interfered with any of Defendant Medina's

official functions, other than refusing to provide her identification.  In doing so, although she was

loud and sought to walk away, Plaintiff did not engage in any physical act that constitutes

interference.  *See e.g. Uzoukwu*, 805 F.3d at 414 (citing *People v. Tillman*, 706 N.Y.S.2d 819,

820-21 (City Ct. 2000) (dismissing charges for obstruction of governmental administration

where suspect in narcotics investigation ran from police after being stopped for questioning

because flight did not constitute physical interference)); *id*. (citing *In re Kezzia T.*, 709 N.Y.S.2d

401, 402 (1st Dep't 2000) (Appellants' untruthfulness and subsequent refusal to disclose location

do not satisfy elements of obstructing governmental administration)).

     To the extent that Defendants argue that Defendant Medina was entitled to request

Plaintiff's identification and detain her if she refused, that argument is unavailing.  Defendants

cite no legal authority that requires individuals to carry identification and produce it upon

request, nor could they.  New York law permits an officer stopping someone to demand certain

limited information under certain circumstances, but does not require production of

identification.  New York Criminal Procedure Law § 140.50 permits an officer to stop  "a person in a public place located within the geographical area of such officer's employment when he reasonably suspects that such a person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor defined in the penal law, and may demand of him his name, address and an explanation of his conduct."  Here, upon exiting his vehicle, Defendant Medina demanded Plaintiff's identification.  Defendants do not suggest that Defendant Medina suspected that she was committing a felony or misdemeanor at the time.  *See* N.Y. Veh. & Traf. § 155 ("A traffic infraction is not a crime.").  Plaintiff refused repeatedly to produce her identification, and she was not legally required to do so.  When Defendant informed her that he was trying to identify her, Plaintiff readily gave her name.  Any suggestion that Plaintiff's refusal to hand over her identification to Defendant Medina gave rise to probable cause for arrest is incorrect.

Medina also lacked arguable probable cause.  It was not objectively reasonable for Defendant Medina to believe that probable cause existed, and no officers of reasonable competence could disagree on whether probable cause existed.  Although the arguable probable cause standard is deferential, "if officers of reasonable competence would have to agree that the information possessed by the officer at the time of the arrest did not add up to probable cause, the fact that it came close does not immunize the officer."  *Ackerson*, 702 F.3d at 21 (internal quotation marks and citation omitted).

Lacking probable cause or even arguable probable cause for Plaintiff's seizure and arrest, Defendant Medina is not entitled to qualified immunity.  Summary judgment is denied on the Fourth Amendment claim arising from the July 2012 incident.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED as to the September 2011,

January 2012, and June 2012 incidents, and DENIED as to the July 2012 arrest.

The Clerk of Court is directed to close docket number 83.

SO ORDERED.

Dated: September 29, 2016
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

26